UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------- x
                                  :

RICARDO R. WATSON        :               3:19 CV 1504 (RMS)
                                    :

V.                               :
                                    :

ANDREW SAUL, COMMISSIONER   :
OF SOCIAL SECURITY        :       DATE: SEPTEMBER  24, 2020
                                    :
-------------------------------------------------- x

RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER, OR IN THE ALTERNATIVE, FOR REMAND FOR A HEARING, AND
ON THE DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE DECISION OF
THE COMMISSIONER

      This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks

review of a final decision by the Commissioner of Social Security ("SSA") denying the plaintiff

Supplemental Security Income benefits ("SSI").

I.     ADMINISTRATIVE PROCEEDINGS

      The plaintiff filed an application for SSI on May 24, 2016, claiming that he had been

disabled since May 24, 2016[1] due to "mental health." (Doc. No 10, Certified Transcript of

Administrative Proceedings, dated October 11, 2019 ["Tr."] 230-38). The plaintiff's applications

were denied initially and upon reconsideration (Tr. 94-106), and on June 26, 2018, a hearing was

held before Administrative Law Judge ("ALJ") Alexander Peter Borré, at which the plaintiff and

Renee Jubrey, a vocational expert, testified. (Tr. 28-69). On September 26, 2018, the ALJ issued

an unfavorable decision denying the plaintiff's claim for benefits. (Tr. 7-26). On September 26,

2018, the plaintiff requested review from the Appeals Council, and on September 12, 2019, the

---

[1] Initially, the plaintiff reported his onset date of disability as February 23, 2002, but at his hearing before the ALJ, amended his onset date to the date of the filing of his application, May 24, 2016. (*See* Tr. 35, 63).

Appeals Council denied the request, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-6).

On September 25, 2019, the plaintiff filed his complaint in this pending action (Doc. No. 1), and on September 26, 2019, the parties consented to the jurisdiction of a United States Magistrate Judge.  (Doc. No. 8). This case was transferred accordingly. On January 27, 2020, the plaintiff filed his Motion to Reverse the Decision of the Commissioner, or in the alternative, Motion for Remand for a Hearing (Doc. No. 13), with a Statement of Material Facts (Doc. No. 13-2), and a brief in support. (Doc. No. 13-1 ["Pl.'s Mem."]).  On June 26, 2019, the defendant filed his Motion to Affirm (Doc. No. 22), with a brief in support. (*Id*. at 2-23 ["Def.'s Mem."]).  (*See* Doc. Nos. 14-15, 17-19, 21).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner, or in the alternative, Motion for Remand (Doc. No. 13) is GRANTED, and the defendant's Motion to Affirm (Doc. No. 22) is DENIED.

II.   FACTUAL BACKGROUND

The Court presumes the parties' familiarity with the plaintiff's medical history, which is discussed in the Statement of Facts. (Doc. No. 13-2). Though the Court has reviewed the entirety of the medical record, it cites only the portions of the record that are necessary to explain this decision.[2]

A.   PLAINTIFF'S TESTIMONY

The plaintiff testified before the ALJ on June 26, 2018. (Tr. 32). On the date of the hearing, the plaintiff was forty years old, living in an apartment with a roommate. (Tr. 37-38).  He attended

---

[2] The plaintiff's arguments on appeal do not address his physical limitations due to his knee impairment. Accordingly, while the Court has reviewed those records, they are not addressed except to the extent that such records bear on issues before the Court.

school until eighth grade, and the only job he held since 2002 was as a dishwasher for a three-month period for his aunt.  (Tr. 39-40).  He cleaned up after himself at home and did grocery shopping "sometime[s]." (Tr. 47-48). He also would travel by bus to New York to see his mother. (*Id.*)

The plaintiff explained that he could not work because he could not read, he could not stand for long periods of time, he took medication that made him "extra" sleepy so he "can't get up[,]" and he heard "voices and all kind of crazy stuff."  (Tr. 40-41).  When the plaintiff was thirteen years old (*see* Tr. 560), he was shot five times, including in the leg. (Tr. 41). He was told he needed a right knee replacement as a result of his gunshot wounds, and he needed scar revision, but he missed his appointment to address surgery because he "extra overslept."  (Tr. 41-42).  He wore a knee brace "sometime[s]."  (Tr. 43).  At the time of the hearing, he had a prescription for physical therapy, but he had not started sessions.  (Tr. 42).  As a result of his right knee pain, he could not walk more than a block.  (Tr. 45).

The plaintiff testified that he had an in-patient psychiatric hospitalization in the 1990s when he had attempted suicide (Tr. 43), and at the time of the hearing, he saw a psychiatrist for medication management. (*Id.*).  He would hear voices that "come and go" "telling [him] stuff" like to get a job and "get money" but, when he tried to get a job, no one would hire him because "they say [he is] handicapped."  (Tr. 50).  He referred to the voices he heard as a "he" who had been "around [him] a long time.  He doesn't just stop. Even when I [was shot], sometime[s] he [told] me to go back and [get] revenge."  (Tr. 51).  He explained that he tried to get a dishwasher job but because he did not know how to use a computer and could not read, he could not apply.  (Tr. 50). During the hearing, the ALJ offered for the plaintiff to take a break, following which the plaintiff

stated, "[T]his is like a nightmare, right? It starts since I was a kid, 14 years old. Since I ever get [expletive] shot." (Tr. 52).

The plaintiff testified that he did not trust people, and, at the time of the hearing, he felt angry all the time. (Tr. 52-53). When he was angry, he would break things. (Tr. 53). When it rained, his body ached and he did not want to get out of bed. (Tr. 53-54). He did not shower unless someone told him he smelled, and people would laugh at him for his odor and appearance. (Tr. 54).

When asked about his substance use, the plaintiff testified that his drug of choice was crack cocaine and that he last used it a week before the hearing. (Tr. 44-45). He had asthma which "sometime[s]" affected his breathing when it was cold. (Tr. 45).

The vocational expert testified that the plaintiff's past work as a dishwasher was classified as medium work. (Tr. 56). When asked if someone who was limited to light work with simple and repetitive tasks in an environment that did not require interaction with the public or teamwork or collaborative tasks, and who could only occasionally climb ramps and stairs, kneel, crouch, and crawl, and could not be exposed to temperature extremes or extreme wetness, that person could perform the work of a "marker," routing clerk, or mail clerk. (Tr. 56-57). The jobs of a marker and routing clerk, however, require reading. (Tr. 58). The vocational expert testified that if such a person were off-task fifteen percent of the workday due to pain or anxiety, such a person would not be employable. (Tr. 57-58). Similarly, if such a person were out of work twice a month consistently, that person could not perform work at any level. (Tr. 58).

III.   <u>THE ALJ'S DECISION</u>

Following the five-step evaluation process,[3] the ALJ found that the plaintiff had not engaged in substantial gainful activity since May 24, 2016, his application date and amended alleged onset date. (Tr. 12, citing 20 C.F.R. §§ 416.920(b) and 416.971 *et seq.*).

At step two, the ALJ found that the plaintiff had the following severe impairments: right knee osteoarthritis, status post gunshot wound, bipolar disorder, PTSD, schizophrenia and polysubstance abuse. (Tr. 12, citing 20 C.F.R. § 416.920(c)).

The ALJ concluded at step three that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 13). Specifically, the plaintiff's physical impairments did not meet or medically equal the criteria of listing 1.02 (Major Dysfunction of a Joint), and his mental impairments, including the substance use disorders, did not meet listings 12.03 (Schizophrenia, Paranoid and other Psychotic Disorders), 12.04 (Depressive, Bipolar, and Related Disorders), or 12.15 (Trauma and Stressor Related Disorders). (Tr. 13-14, citing 20 C.F.R. § 416.920(d)).

---

[3] First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 416.920(a). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 416.920(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. § 416.920(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79–80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 416.920(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. § 416.1520(a)(4)(iv). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 416.920(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

The ALJ concluded that the plaintiff, with the substance use disorder, had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 416.967(b), except that he could not climb ladders, ropes, or scaffolds or tolerate exposure to hazards; he could occasionally climb ramps and stairs, and kneel, crouch, and crawl; he could tolerate occasional temperature extremes and extreme wetness; he could perform simple, repetitive tasks in an environment without public interaction, teamwork, or collaborative tasks; and, he would be off task fifteen percent of the workday and out of work two times per month.  (Tr. 15).

At step four, the ALJ concluded that the plaintiff was unable to perform any past relevant work; however, at step five, the ALJ found that, when including the plaintiff's substance use disorder, there were no jobs that exist in the national economy that the plaintiff could perform. (Tr. 21-22).

"When there is medical evidence of an applicant's drug or alcohol abuse, the 'disability' inquiry does not end with the five-step analysis." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012). "In that circumstance, on the issue of disability *vel non*[,] '[t]he critical question is whether the SSA would still find the claimant disabled if [he] stopped using drugs or alcohol.'" *Wehrhahn v. Colvin*, 111 F. Supp. 3d 195, 199 (D. Conn. 2015) (citing *Cage*, 692 F.3d at 123. (internal quotation marks and brackets omitted)).

Next, therefore, the ALJ determined that, if the plaintiff stopped the substance use, he would continue to have a severe impairment or combination of impairments, but he would not have an impairment that met or would medically equal any of the limited impairments.  (Tr. 22, citing 20 C.F.R. § 416.920(d)).  If he stopped the substance use, the claimant would have the RFC to perform light work, except he would not be able to climb ladders, ropes, or scaffolds or tolerate exposure to hazards; he could occasionally climb ramps and stairs, kneel, crouch, and crawl; he

could tolerate occasional temperature extremes and extreme wetness; and, he could perform simple, repetitive tasks in an environment without pubic interaction, teamwork, or collaborative tasks. (Tr. 23-24). The ALJ determined that, if the plaintiff stopped the substance use, he would continue to be unable to perform his past relevant work (Tr. 25, citing 20 C.F.R. § 416.965), but considering his RFC, he could perform other work in the national economy, including the work of a marker, routing clerk, and mail clerk. (Tr. 25-26). Accordingly, the ALJ concluded that the plaintiff's substance use disorder was a contributing factor material to the determination of disability because the plaintiff would not be disabled if he stopped the substance use. (Tr. 26, citing 20 C.F.R. §§ 416.920(g) and 416.935)).

## IV.   STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). "The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact." *Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citing *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)). However, the

court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V.    DISCUSSION

The plaintiff argues that the ALJ erred in four respects, the first two of which are intertwined. First, the ALJ failed properly to evaluate the materiality of the plaintiff's substance abuse under Social Security Ruling 13-2p. (Pl.'s Mem. at 3-12).  Second, in failing properly to evaluate the materiality of the plaintiff's substance abuse, the ALJ did not follow the treating physician rule.  He afforded little weight to the opinions of the plaintiff's treating psychiatrist, Dr. Melman, and assigned different weight to his opinion based on the ALJ's assumptions. He also erred in the weight he assigned both to the consultative examiner based on his interpretations of the examiner's opinion and to the non-examining physicians who saw only partial records.  (Pl.'s Mem. at 12-20). Third, the ALJ did not formulate an accurate RFC by failing to include in his RFC the finding that the plaintiff had moderate limitations in his ability to concentrate, persist or maintain pace. (Pl.'s Mem. at 21-22, citing SSR 96-8p).  Fourth, the ALJ failed to include all impairments and limitations in his inquiries to the vocational expert, resulting in the failure to satisfy the Commissioner's burden at step five. (Pl.'s Mem. at 22-24).

The defendant counters that, contrary to the plaintiff's assertion, a treating source opinion on the plaintiff's ability to perform work-related activities if he stopped abusing drugs was not

required. (Def.'s Mem. at 6-7). The defendant also argues that the ALJ relied on relevant evidence to support his conclusion that, if the plaintiff stopped his drug use, he would no longer be off-task fifteen percent of the time or miss work twice a month. (*Id.*). Additionally, the defendant asserts that the ALJ provided good reasons for the weight he assigned to the medical opinions in the record. (Def.'s Mem. at 7-19). Finally, the defendant argues that the ALJ appropriately included all supported impairments and limitations in his RFC assessment and met his burden at step five. (Def.'s Mem. at 18-20).

### A.    THE ALJ ERRED IN HIS EVALUATION OF THE MATERIALITY OF THE PLAINTIFF'S SUBSTANCE USE DISORDER AND DID NOT PROPERLY APPLY THE TREATING PHYSICIAN RULE

Pursuant to 42 U.S.C. § 423(d)(2)(C):

> An individual shall not be considered to be disabled for purposes of this title if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled.

It is the claimant, not the Commissioner, who bears the burden of proving that drug or alcohol abuse ("DAA") was not a contributing factor material to disability. *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 125 (2d Cir. 2012). When making the determination of whether DAA is a contributing factor material to a disability determination, the Commissioner must consider "whether [the plaintiff] would still [be] disabled if [the plaintiff] stopped using drugs or alcohol." 20 C.F.R. § 416.935(b)(1). To reach this determination, the Commissioner must evaluate "which of [the plaintiff's] current physical and mental limitations, upon which [the Commissioner] based [the] current disability determination, would remain if [the plaintiff] stopped using drugs or alcohol and then determine whether any or all of [the plaintiff's] remaining limitations would be disabling." 20 C.F.R. § 416.935(b)(2). If the Commissioner determines that a plaintiff's "remaining limitations are disabling," the plaintiff will be found disabled independent of the drug

or alcohol abuse, and the Commissioner will find that the "drug addiction or alcoholism is not a contributing factor material to the determination of disability."  20 C.F.R. § 416.935(b)(2)(ii).  If the Commissioner concludes that those remaining limitations would not be disabling, the Commissioner will find that the drug or alcohol abuse "is a factor material to the determination of disability."  20 C.F.R. § 416.935(b)(2)(i).

In this case, the ALJ concluded that the plaintiff's mental impairments would improve to the point that they would be non-disabling if the plaintiff stopped his substance use.  (Tr. 24-25).  To reach such a conclusion, an ALJ must "project the severity of the claimant's other impairment(s) in the absence of DAA[,]" and, to do that, the ALJ must make his finding based on the evidence in the case record and medical judgments.  Social Security Ruling ["SSR"] 13-2P, 2013 WL 621536, at *8 (S.S.A. Feb. 20, 2013).  When claimants do not have a period of abstinence, "an acceptable medical source can provide a medical opinion regarding whether the claimant's impairments would be severely limiting even if the claimant stopped abusing drugs or alcohol."  *Id.* at *9.  Thus, the ALJ must consider the opinions of the acceptable medical sources and, applying the treating physician rule, must explain the reasons for the weight he assigns to these sources.  *See Burgess,* 537 F.3d at 128; 20 C.F.R. § 404.1527 (c)(2)).

Turning to the opinions of the record, the ALJ considered the opinions of the plaintiff's treating physician, Dr. Melman and LCSW Gadalinski, the opinion of the consultative examiner, Dr. Cudrin, the opinions from the non-examining State-agency psychologists, and the opinion from the non-examining consultant.  Because the plaintiff bears the burden of proving whether DAA is material to the disability determination, the ALJ does not err if the record can support a conclusion that the plaintiff's substance use was material to the finding of disability, and substantial evidence supports that finding. *Johnson v. Berryhill*, 17-V-6436P, 2018 WL 4275985, at *13 (W.D.N.Y.

Sept. 7, 2018) (affirming ALJ's decision where ALJ considered psychologist and mental health counselors' treatment notes documenting mental health improvement during periods of abstinence and finding the "record was sufficient to permit the ALJ to conclude that [plaintiff's] substance use was material to the finding of disability, and substantial evidence supports the finding") (citing *Smith v. Comm'r of Soc. Sec. Admin.*, 731 F. App'x 28, 30 (2d Cir. 2018) (summary order) ("[claimant] did not demonstrate that her substance abuse was not a material factor, and substantial evidence supported the ALJ's determination that it was[;] [plaintiff's] medical records showed that her . . . functioning improved when she underwent substance abuse treatment"); *Rowe v. Colvin*, 8:15 CV 652(TWD), 2016 WL 5477760, *8 (N.D.N.Y. 2016) ("[t]he medical evidence also supports a finding that [claimant's] functioning improved since [claimant] abstained from alcohol, including periods of 'brief sobriety'"). *See also Cage*, 692 F.3d at 127 (substantial evidence supports determination that claimant would not be disabled were she to discontinue drug and alcohol abuse despite absence of evidence of "extended periods of sobriety")). *See Ervin-Atkinson v. Comm'r of Soc. Sec.*, No. 18-CV-1056-FPG, 2020 WL 830434, at *3 (E.D.N.Y. Feb. 20, 2020).

The plaintiff, however, argues that "none of the medical opinions of record distinguishes [the plaintiff's] functional limitations with and without the presence of substance use, and none of them contain evidence that his mental disorders would improve to the point of non-disability without the presence of his DAA." (Pl.'s Mem. at 4).

The plaintiff's medical record reveals a history of mental illness, pre-dating his onset date of disability. (Tr. 330-447). Between September 3, 2013 and November 14, 2014, the plaintiff was treated at Community Mental Health Affiliates by Drs. Edgardo Lorenzo and Margaret Chaplin, both psychiatrists. At that time, he was diagnosed with bipolar I disorder, most current episode depressed, severe with psychotic features, with rapid cycling; panic disorder without

agoraphobia; alcohol dependence sustained full remission; tobacco use disorder; cannabis abuse in remission; and cocaine abuse in remission.  (Tr. 375, 387).  The plaintiff reported one attempt to commit suicide when he was incarcerated, and he reported visual and auditory hallucinations when he was severely depressed.  (Tr. 374-75, 386-87).  There is no record of substance use at this time.

On May 25, 2016, at the time of his disability onset, the plaintiff presented to Christopher Hale, a Licensed Alcohol Drug Abuse Counselor ("LADC"),[4] at the Community Health Center ("CHC") for a primary diagnosis of PTSD, and secondary diagnoses of alcohol abuse and depression.  (Tr. 560, 563; *see* Tr. 702, 704). At that time, he reported marijuana and alcohol use. (Tr. 563, 704).  On a mental status exam, the plaintiff had a depressed mood, and moderate impairments of judgment and insight (Tr. 562, 703), and Hale noted that the plaintiff presented with anxiety, depression and anger due to "past traumas."  (Tr. 563, 704).

He was seen again at CHC on June 13, 2016 for follow up care for chronic right knee pain "status post gunshot wound," PTSD and depression.  (Tr. 489, 558, 699).  He did not report any drug use (*id.*), and the provider noted that the plaintiff should continue behavioral health appointments because he "may qualify for SSD for MH [mental health]."  (Tr. 490, 559, 700).  On June 22, 2016, the plaintiff reported an increased level of anxiety and flashbacks of being shot; his primary diagnoses were generalized anxiety and PTSD, with the secondary diagnoses of substance abuse and depression.  (Tr. 556-57, 697-98).

The plaintiff underwent psycho-pharmacotherapy intake with Tricia Mignosa, APRN at CHC on July 8, 2016.  (Tr. 553, 694).  The plaintiff reported feeling depressed and irritable most

---

[4] The plaintiff was seen periodically by Hale on August 1, 2016 (Tr. 527, 689), February 6, 2017 (Tr. 519, 683), and March 27, 2017 (Tr. 679).

of the time, every day, and he acknowledged that he used marijuana to calm himself. (Tr. 553, 694). He endorsed paranoid ideations expressing that someone was out to ruin his life by hacking into his cell phone. (*Id.*).  Mignosa found avoidant eye contact, speech perseveration, anxious mood, thought process perseveration, remote memory impairment, moderate inattentiveness, and moderate impairments of judgment and insight. (Tr. 553-54). Her primary diagnosis was bipolar disorder, with moderate cannabis use disorder. (*Id.*)

The plaintiff began physical therapy for chronic pain of the right lower extremity at the Hospital of Central Connecticut on June 27, 2016, and he attended weekly sessions until August 22, 2016. (Tr. 466, 464, 470, 472-73, 498).  The plaintiff had been "self-medicating with pills on the streets, weed and drinking."  (Tr. 498).

On July 12, 2016, the plaintiff underwent a consultative examination with Jay Cudrin, Ph.D. who identified the following diagnoses: bipolar disorder, PTSD, history of cannabis dependence, history of polysubstance abuse (cocaine, alcohol, various other substances), and antisocial personality disorder. (Tr. 453). Dr. Cudrin noted that,

> Mr. Watson endorsed so many psychiatric symptoms it was hard to know whether he was being sincere. There were some that were consistent with his life experiences though: He reported frequent flashbacks and nightmares about being shot. He denied current suicidal impulses but thought of them when he got angry. He had bouts of energetic self-confidence, frequent fights, and periods of excitement. He also said he had phobias and panic attacks but did not know what each of these terms meant. He had good self-concept and manic optimism about the future. 'If I stay alive I am going to be rich!' He said he heard voices calling his name and saw the future before it occurred. He showed no signs of bizarre or inappropriate behavior.

(Tr. 453)

Upon examination, the plaintiff "had trouble with cognitive demands that children master at a young age: He could not tell time with an analog clock, could not consistently distinguish right from left, and did not know the value of basic amounts of money." (Tr. 453).  He "had problems

with his short-term memory," "trouble with concentration," could not recite months of the year backward. (*Id.*).

In his Medical Source Statement, Dr. Cudrin wrote: "Mr. Watson had a history of mood swings, fighting and repeated incarcerations. He took psychiatric medications, but it was hard to know whether [they] diminished symptoms. He reported being shot five times and getting into fights since his discharge from prison a few months ago. He could not handle simple cognitive demands. All these factors would interfere with appropriate job performance and employment relationships[,]" and if he were awarded benefits, he would need assistance with financial management. (*Id.*).

The ALJ assigned this opinion "little weight if substance use is not considered" because Dr. Cudrin "did not consider the effects of [the plaintiff's] substance use[.]" (Tr. 24). The ALJ noted, "[i]n fact, he was not aware of the full extent of his issues, as his diagnoses indicated a mere 'history' of polysubstance abuse." (*Id.*). The ALJ's understanding of Dr. Cudrin's assessment, however, would seem to support the plaintiff's claim of disability because, if Dr. Cudrin assessed the plaintiff with the foregoing limitations when he believed the plaintiff to be in remission from substance use, his assessment reflects that the plaintiff's mental limitations, not DAA, interfered with the plaintiff's ability to perform work.

The ALJ also concluded that the opinion from the plaintiff's treating providers did not account for his substance abuse. The plaintiff began treating with Dr. David Melman at CHC on July 29, 2016, for psychopharmacotherapy; he reported regular use of cannabis and alcohol. (Tr. 529-30, 691-92). Upon examination, Dr. Melman noted avoidant eye contact, moderately pressured speech, depressed and irritable mood, angry and constricted affect, tangential thought process, reports of auditory hallucinations telling him to do self-harm, and deficient judgment and

insight. (*Id.*). He assessed "[c]annabis use disorder, moderate, dependence" as the plaintiff's primary diagnosis, and "[s]chizoaffective disorder[]" and "[t]obacco use disorder, mild[] as the secondary diagnosis, and noted: "rule out alcohol use disorder." (Tr. 530).

Nearly a year later, on March 28, 2017, the plaintiff returned to Dr. Melman. (Tr. 568, 677). At that time, he found psychomotor slowing, dysphoric mood, and constricted affect, and he noted that he had not seen the plaintiff in some time, so he was removing schizoaffective disorder as his primary diagnosis, explaining that he replaced it with unspecified mood disorder in lieu of a more specific diagnosis until he got to know the plaintiff better. (Tr. 569). A month later, on April 25, 2017, the plaintiff tested positive for cocaine and marijuana; Dr. Melman found tangential thought process and assigned him a primary diagnosis of cannabis use disorder. (Tr. 572-73, 672-73).

On April 24, 2017, the plaintiff was seen by Hale for a therapy session; Hale's primary diagnosis was generalized anxiety disorder and PTSD, with secondary diagnoses of substance abuse and depression. (Tr. 570-71). Hale's assessment remained the same on May 10, and 24, and June 12, 2017. (Tr. 577-80, 583-84).

The plaintiff was seen again at the emergency department on June 30, 2017 for a dystonic reaction to Haldol which he was supposed to stop taking, but which he took inadvertently. (Tr. 743). On August 21, 2017, Dr. Melman noted an angry mood, and angry, tearful and full affect, with tangential thought process, and paranoid themes without well-founded delusions. (Tr. 587-88, 657-58). He was assessed with moderate cannabis disorder as his primary diagnosis, and severe opioid disorder, severe cocaine use disorder, unspecified mood disorder and mild tobacco use disorder as the secondary diagnoses. (*Id.*)

On August 25, 2017, the plaintiff presented to CHC for bee stings, "very high" on marijuana. (Tr. 590, 655). On September 18, 2017, the plaintiff reported to Dr. Melman that he abused Vicodin over the weekend and used cannabis daily. (Tr. 594, 651). His mood and affect were angry, and his thought process tangential and disorganized, requiring frequent redirection. (*Id.*). He recited numerous paranoid themes, particularly about being harmed in some way by others, and reported auditory hallucinations to hurt others. (*Id.*) Dr. Melman wrote: "Client disorganized, paranoid presentation has been consistent at all visits. I believe this reflects an underlying schizophrenia, which I add to the [diagnosis] list." (*Id.*).  Dr. Melman kept cannabis use disorder as the primary diagnosis.  (*Id.*).

On October 16, 2017, the plaintiff described command auditory hallucinations to harm others, stating also that he was able to rebuff these by thinking of legal consequences and his commitment to avoid altercations. (Tr. 599, 646). His mood was often angry, with tangential, disorganized thought process. (*Id.*)  The records reflect: "Paranoia: fears that roommate trying to poison him (so he moved his food to a downstairs, locked location). Reports [auditory hallucinations] to hurt others, last time several days ago." (*Id.*). Dr. Melman noted that the differential diagnosis ("DDx") included "substance induced psychosis[,]" and that "[h]is refusal to provide a urine or saliva sample suggest[ed] that substance use is playing a role." (*Id.*).

The plaintiff began treating with Jennifer Gadalinski, LCSW, on December 13, 2017.  (Tr. 604, 643).  She noted he was illiterate, and she assessed him with a primary diagnosis of PTSD, and secondary diagnoses of paranoid schizophrenia and substance abuse. (*Id.*).

On examination by Dr. Melman on February 19, 2018, the plaintiff had mild sedation, irritable mood, tangential and disorganized thought process, and reported that others were out to bring him down and harm him in some way; he was having an auditory hallucination of door

knocking and said he saw a ghost the previous night. (Tr. 607, 638). Dr. Melman noted that toxicology reports from November 2017 showed active use of multiple substances, not matching the plaintiff's self-report, and he urged participation in a substance abuse program. (*Id.*).

During psychotherapy sessions with Gadalinski on February 28, 2018, the plaintiff discussed his mistrust of others (Tr. 609-10, 636-37); on March 14, 2018, he reported finding mason jars at a work site, that he believed held curses (Tr. 613-14, 632-33), and on April 12, 2018, he stated that he did not trust "the system." (Tr. 615-16). On March 2, 2018, the plaintiff was treated in the emergency department and admitted for a cocaine overdose. (Tr. 768, 810, 812).

Two months later, on May 7, 2018, Dr. Melman and Gadalinksi completed a Mental Impairment Questionnaire assessing the plaintiff's "[p]rincipal [d]iagnoses" as PTSD, paranoid schizophrenia, and substance abuse. (Tr. 733-38). They recorded clinical findings of a history of violence, poor impulse control, mood swings, and paranoia, with a poor prognosis. (Tr. 733). Signs and symptoms included: delusions or hallucinations, depressed mood, recurrent, impulsive, aggressive behavioral outbursts, irritability, disregard for and violation of rights of others, distrust and suspiciousness of others, and significant difficulties learning and using academic skills. (Tr. 734). They assessed the plaintiff as unable to understand and remember very short and simple instructions, carry out very short simple instructions, sustain ordinary routine without special supervision, work in coordination with or in proximity to others without being unduly distracted, make simple work-related decisions, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, deal with normal stress, or be aware of normal hazards and take appropriate precautions. (*Id.*).

In particular, Dr. Melman and Gadalinski cited the plaintiff's sporadic attendance with providers, frequent missed appointments, paranoia, suspicious and irritable behavior, extreme mood swings, and poor coping skills. (Tr. 735). They assessed the plaintiff with "no useful ability to function" regarding the aptitude to complete a normal workday and workweek without interruptions from psychologically-based symptoms. (*Id.*). They found the plaintiff seriously limited in interacting appropriately with the general public due to mood swings and irritability, and seriously limited in maintaining socially appropriate behavior due to often raising his voice and getting paranoid of others. (Tr. 736). They noted that he completed the ninth grade and was illiterate and unable to read or complete forms on his own. (*Id.*).  They assessed the plaintiff as "markedly" limited in his ability to understand, remember, and apply information; interact with others; and adapt and manage oneself in the workplace. (Tr. 734).  Additionally, they found the plaintiff "moderately" limited in the ability to concentrate, persist, and maintain pace.  (Tr. 737). Dr. Melman and Gadalinski anticipated that the plaintiff's impairments would cause him to be absent more than four days per month. (Tr. 738).

The ALJ assigned "little weight" to this opinion because it "did not address his substance abuse or its effects other than to state that substance abuse was a diagnosis."  (Tr. 23).  Contrary to the plaintiff's contention, it is not error *per se* for an ALJ to reach a decision regarding DAA in the absence of a treating source opinion addressing whether DAA is a contributing factor to the plaintiff's alleged disability. The Second Circuit has made clear that there is no bright-line rule that such medical opinion is necessary for an ALJ to conclude that, in fact, DAA is a contributing factor to the determination of disability.  *Cage*, 692 F.3d at 126. Moreover, even when the record lacks medical evidence during periods of sobriety, as in this case, the ALJ may rely on other evidence in the record such as, "positive evaluations . . . during inpatient admissions when [the

plaintiff did not have access to drugs or alcohol[]"; mental status evaluations; the plaintiff's ability to perform tasks, follow instructions or handle finances; the plaintiff's ability to interact with others adequately, and the plaintiff's reports about the effect of DAA and the plaintiff's other impairments. *Id.* "Taken together, this is 'relevant evidence [that] a reasonable mind might accept as adequate to support [the] conclusion'" that the plaintiff's difficulties would improve in the absence of DAA. *Id.* (quoting *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010)).

In this case, the ALJ relied on what he described as the plaintiff's "high level of daily function" reflected in his ability to live on his own and take public transportation. The ALJ described the plaintiff's lack of cleanliness as due to a lack of motivation for which "one cannot rule out that substance use plays a significant role . . . , especially given his tendency to attend drug-filled parties and overdose." (Tr. 25). He noted that the plaintiff's "treating and examining providers have suggested that his substance abuse might play a significant role in his symptoms." (*Id.*). Additionally, he relied on "a diagnosis of substance-induced psychosis[,]" the fact that Dr. Cudrin "noted that [the] plaintiff's reports of mental symptoms appeared insincere," and the plaintiff's citation of his "history of incarceration, physical problems, and alleged illiteracy" instead of his mental symptoms to explain why he could not work.[5] (Tr. 24).

The plaintiff's daily activities, self-reports, and assessment of a consultative examiner, may be the sort of evidence upon which the ALJ could rely in making his determination of whether DAA is a contributing factor to a claimant's disability, but, as discussed below, the ALJ's assessments in this case contain serious misstatements of the record, and his rejection of the

---

[5] It is unclear why the ALJ refers to the plaintiff's illiteracy as "alleged." (Tr. 24). There is nothing in the record to state otherwise. Instead, there are multiple references to the plaintiff's illiteracy, and the vocational expert testified that the plaintiff must be able to read and write in order to perform two of three jobs that the ALJ concluded he was capable of performing. In light of the remand in this case on other grounds, the ALJ must revisit the evidence, and when doing so, the ALJ shall consider and incorporate the plaintiff's illiteracy into his findings.

opinions of the plaintiff's treating providers stemmed from his failure to apply the treating physician rule.

The plaintiff's primary diagnoses throughout the record are PTSD, bipolar disorder, generalized anxiety disorder and, at times, cannabis use disorder. *See Wehrhahn*, 111 F. Supp. 3d at 205–06 (noting that the ALJ is entitled to rely on evidence that substance abuse is the "primary impairment" and the "remaining affective disorders" are the secondary impairments to conclude that, in the absence of that primary impairment, the claimant would not be precluded from gainful employment). Repeatedly, substance abuse is noted as a secondary diagnosis, and although the ALJ relied on "a diagnosis of substance-induced psychosis[,]" at no time was the plaintiff diagnosed with substance-induced psychosis.[6] (Tr. 24).

In his characterization of the evidence, the ALJ indicated that Dr. Melman found substance abuse playing a "significant role." (Tr. 24). Dr. Melman, however, noted that the plaintiff's refusal to provide a urine or salvia sample upon request "suggests that substance abuse is playing a role." (Tr. 599). Moreover, although the ALJ stated that Dr. Cudrin found the plaintiff's report of "mental symptoms appeared insincere," Dr. Cudrin's actual comment was that "it was hard to know whether he was being sincere" about his symptoms because he endorsed all that were presented. (Tr. 452). Notably, the ALJ omitted the next sentence in that report wherein Dr. Cudrin did not dismiss the plaintiff's report as insincere, but rather noted that some of the plaintiff's symptoms "were consistent with his life experiences." (Tr. 452). Moreover, although the plaintiff did not consistently attribute his mental limitations to his reason for not working, the plaintiff's treating providers detailed how the plaintiff's mental impairments affected his ability to work. Although

---

[6] Dr. Melman listed substance-abuse psychosis as a differential diagnosis. (Tr. 599, 646). A differential diagnosis "is a list of possible conditions or diseases that could be causing" symptoms. . . . After developing a differential diagnosis, your doctor may then perform additional tests to begin to rule out specific conditions or diseases to come to a final diagnosis." *See* https://www.healthline.com/health/differential-diagnosis (last visited August 4, 2020).

not referenced by the ALJ, the plaintiff testified that, among the reasons he could not work was that he heard "voices and all kind of crazy stuff[,]" he "[a]lways remember[ed] things [t]hat happen to me[,]" and he "don't like being around people because I think everybody about to get me or something." (Tr. 41).

In addition to the misstatements in the record, the ALJ erred in his treatment of the treating providers' opinions. The treating physician rule requires that "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well- supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(d)(2)) [now (c)(2)]). As the Second Circuit has made clear, when the ALJ "do[es] not give the treating source's opinion controlling weight," as happened here, he must "explicitly consider" the factors listed in 20 C.F.R. § 404.1527(c)(2), including "'(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist.'" *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019) (quoting *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam)). Unless after "'a searching review of the record'" the reviewing court is "assure[d] . . . that the 'substance of the treating physician rule was not traversed,'" the ALJ's failure to apply these factors requires the remand. *Estrella*, 925 F.3d at 96 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)).

In this case, the ALJ erred in failing to explicitly consider the length, nature and extent of the treatment of the plaintiff's treating providers which constitutes "procedural error." *Estrella*, 925 F.3d at 96. Specifically, the ALJ ignored the fact that this opinion reflected years of treatment history with Dr. Melman and, more recently, with Gadalinski, and the records of that treatment

address their intimate familiarity with the plaintiff's mental health and substance abuse. Additionally, he failed to address the consistency of their opinion with the other opinions in the record. *See Burgess,* 537 F.3d at 128; *see* 20 C.F.R. § 404.1527(c)(2).

Consistent with other findings in the record, Dr. Melman and Gadalinksi assessed the plaintiff as unable to understand and remember very short and simple instructions, carry out very short simple instructions, sustain ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted, make simple work-related decisions, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, deal with normal stress, or be aware of normal hazards and take appropriate precautions. (Tr. 734). Additionally, they found the plaintiff seriously limited in interacting appropriately with the general public due to mood swings and irritability, seriously limited in maintaining socially appropriate behavior due to often raising his voice and getting paranoid of others (Tr. 736), illiterate, and "markedly" limited in his ability to understand, remember, and apply information; interact with others; and adapt and manage oneself in the workplace. (Tr. 734).

Dr. Melman and Gadalinksi's opinion is largely consistent with Dr. Cudrin's opinion that the plaintiff could not handle simple cognitive demands, had "problems with his short-term memory" and "trouble with concentration[,]" and these factors would interfere with job performance. (Tr. 453). Similarly, Christopher Hale repeatedly noted that the plaintiff had impaired thought process and moderate impairment in his judgment and insight, and he treated him for his primary diagnoses of generalized anxiety and PTSD. (Tr. 577, 579, 585, 660, 666,

668).  APRN  Mignosa  similarly  found  memory  impairment,  moderate  inattentiveness,  and

moderate impairments of judgment and insight.  (Tr. 553-54).

The ALJ assigned "significant weight" to Dr. Melman and Gadalinksi's opinion when

considering  the  plaintiff's  substance  use  disorder,  but  then  assigned  the  same  opinion  "little

weight"  when substance use was not considered, stating that the same opinion that he assigned

"significant  weight"  to  when  addressing  the  impact  of  the  plaintiff's  substance  use,  did  "not

address his substance use or its effects other than to state that substance abuse was a diagnosis."

(Tr. 18). This is perplexing.  The plaintiff argues that this "curiosity in this Decision" of assigning

"'significant  weight'  on  one  page,  yet  'little  weight'  on  another"  is  a  "function  of  the  ALJ

*assuming*, without evidence, that the treating providers' opinions on limitations were driven by,

and necessarily underpinned by their appreciation of Mr. Watson's substance abuse." (Pl.'s Mem.

at 16) (emphasis in original).  The Court agrees.

In his first analysis, the ALJ assumed that the treating providers considered the plaintiff's

substance abuse in the assessments, but then rejected the same opinion in his second analysis

because of his assumption that the providers determined that the plaintiff's DAA was material.

The  ALJ's  decision  to  reject  the  treating  providers'  opinions  because  he  assumed  that  they

determined  that  the  plaintiff's  DAA  was  material,  is  not  based  on  substantial  evidence.

Furthermore, rather than applying the treating physician rule, the ALJ rejected these opinions

purely because of this erroneous assumption he made about the basis for their opinions. *See Lee v.*

*Saul*, No. 5:19 CV 136 (BKS), 2020 WL 563430, at *9 (N.D.N.Y. Feb. 5, 2020) (quoting *Estrella*,

925 F.3d at 96) (holding that the Court "must determine if 'the substance of the treating physician

rule'  was  'traversed'  by  examining  whether  the  ALJ  provided  'good  reasons'  for  his  weight

assignment"). The ALJ's failure to apply the treating physician rule, and then his  failure to

articulate "good reasons" for according "little weight" to the treating physicians' opinion constitutes error.   *Id.*

Moreover, while State agency medical consultants' opinions may override the opinions of treating physicians, *see* 20 C.F.R. §§ 416.913a(b)(2), 416.927(e)(2), the ALJ's assignment of "great weight" to these opinions is not supported by substantial evidence. The non-examining State agency psychological consultants found the plaintiff capable of following simple instructions and performing simple tasks, and, moderately limited in his work-related abilities (Tr. 71, 88-89). The ALJ assigned "great weight" to these opinions "when disregarding substance use." (Tr. 24). But similar to the plaintiff's treating providers, non-examining State agency consultant Michelle Nito Neveille, Psy.D., found that the plaintiff had a severe personality disorder, and identified a "pervasive pattern" of "[d]isregard for and violation of rights of others" and "[i]nstability of interpersonal relationships." (Tr, 85; *see* Tr. 77-91). The State-agency consultants did not attribute all of the plaintiff's limitations to DAA, noting instead, "DAA ongoing with unclear severity, notable inconsistencies in report." The consultants identified the plaintiff's primary and secondary impairments as affective disorders and anxiety disorders. (Tr. 68-69, 86).

Following the hearing, State agency reviewer Michael Lace, Psy.D. assessed the plaintiff with mild limitations in understanding, remembering, or applying information, and in interacting with others. (Tr. 925). This finding is inconsistent with all other assessments in the record. Additionally, he found moderate limitations in concentrating, persisting, or maintaining pace, and in adapting or managing oneself (*id.*), and he concluded that the plaintiff could perform work "limited to [alcohol] and substance-free workplace," "limited to no fast-paced activities," and "limited to routine tasks." (Tr. 928).  The ALJ assigned this assessment "partial weight" but it is

unclear upon what evidence the ALJ and Dr. Lace based their conclusion regarding the plaintiff's ability to work in the absence of DAA. (Tr. 17).

The ALJ's reliance on the opinions of the non-examining State agency consultants is not supported by substantial evidence given the psychiatric diagnoses. Under such circumstances, it was "improper" for the ALJ to rely on the opinions of "non-treating non-examining doctor[s] because the inherent subjectivity of a psychiatric diagnosis requires the physician rendering the diagnosis to personally observe the patient." *Velazquez v. Barnhart*, 518 F. Supp. 2d 520, 524 (W.D.N.Y. 2007); *see also Carton v. Colvin*, No. 3:13 CV 379(CSH), 2014 WL 108597, at \*15 (D. Conn. Jan. 9, 2014).

### B.   REMAINING ALLEGATIONS OF ERROR

In light of the Court's finding that the ALJ erred in his application of the treating physician rule, the Court need not reach the merits of the plaintiff's remaining arguments given that the "case must return to the agency either way for the reasons already given, [so] the Commissioner will have the opportunity on remand to obviate th[ese] dispute[s] altogether[.]" *Lockwood v. Comm'r of Soc. Sec. Admin.*, 914 F.3d 87, 94 (2d Cir. 2019).  Accordingly, this matter is remanded to the Commissioner for further administrative proceedings consistent with this Ruling.  On remand, the Commissioner will address the other claims of error not addressed in this decision.

### VI.   CONCLUSION

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 13) is GRANTED such that this matter is remanded for additional proceedings consistent with this Ruling, and the defendant's Motion to Affirm (Doc. No. 22) is DENIED.

This is not a recommended ruling.  The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil

Procedure.  Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c).

Dated this 24th day of September, 2020 at New Haven, Connecticut.

/s/Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge